UNITED STATES of America ex rel.
Bruce BARKSDALE,
Petitioner-Appellant,

v.

Frank BLACKBURN, Warden, Louisiana
State Penitentiary,
Respondent-Appellee.

No. 78–2582.

United States Court of Appeals,
Fifth Circuit.

March 16, 1981.

Rehearing Denied April 14, 1981.

John Wilson Reed, New Orleans, La. (Court-appointed), for petitioner-appellant.

Wm. J. Guste, Jr., Atty. Gen., Baton Rouge, La., Harry F. Connick, Dist. Atty., Brian G. Meissner, William F. Wessel, Asst. Dist. Attys., New Orleans, La., John S. Baker, Jr., Baton Rouge, La., for respondent-appellee.

Before GODBOLD, Chief Judge, BROWN, COLEMAN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges.*

AINSWORTH, Circuit Judge:

Bruce Barksdale, seeking to set aside his seventeen-year-old conviction for aggravated rape, appeals from the district court denial of his petition for a writ of habeas

* Judge James C. Hill recused himself and did not participate in this decision. Judge Albert Tate, Jr. did not participate in the consideration or decision of this case. Judge Jerre S. Williams became a member of the court after June 23, 1980, when this case was argued and taken under submission. He does not wish to participate in the decision.

corpus. As the basis for his petition, Barksdale, who is black, alleges that blacks were systematically excluded from the Orleans Parish grand jury which indicted him and from the petit jury venire which included the jurors who convicted him.[1] A panel of this court, with one judge dissenting, agreed with Barksdale's contentions and reversed the district court. *United States ex rel. Barksdale v. Blackburn*, 610 F.2d 253 (5th Cir. 1980). The court then voted to rehear this case en banc, *United States ex rel. Barksdale v. Blackburn*, 616 F.2d 254 (5th Cir. 1980), thus vacating the panel opinion. *See* Fifth Circuit Local Rule 17. We find that there was no systematic exclusion of blacks from the juries and jury venires in question, and therefore now affirm the judgment of the district court.

I. The Factual Background [2]

The facts of this case seem to have "been lost in the 'nice, sharp quillets of the law.'"[3] On the morning of October 3, 1962, Bruce Barksdale followed a young woman to her apartment building in New Orleans' French Quarter. He knocked on her door and inquired whether a couch in the hallway was for sale. As the woman opened the door to respond, Barksdale slammed against the door, shoved the woman back into her apartment, and threatened her with a raised hammer. The woman tried to run past Barksdale, but he grabbed her before she could reach the stairway and forcibly brought her back into the apartment. Barksdale then robbed his victim, pushed her into the bedroom, and shoved her face down onto the bed. He placed his knee in the middle of her back, and told her, "I'm not going to hurt you if you do as I tell you." Barksdale pulled off the wom-

an's skirt, ordered her to remove her blouse, and tore off her underwear. Then, with the hammer still in his hand, Barksdale raped his victim. He told her, "[y]ou know I am going to have to kill you now." The woman begged hysterically for her life, and Barksdale relented after requiring her to swear to tell no one of the incident. As he left the apartment, Barksdale grabbed his victim by the throat and gave her a final warning: "If you ever tell anybody about this I will kill you. I have before and I will again, and I better not see you on the streets."

A short time later, the victim was found in an extremely agitated and distressed condition by her landlord. She was able to give the police a description of her assailant, from which a composite drawing was made. Two workers at a motel across the street from the victim's apartment also gave the police descriptions of a man with a hammer seen in the vicinity that morning. On the basis of these leads, the police were able to apprehend Barksdale the next morning.

The victim positively identified Barksdale on October 4, the day after the attack, in a lineup at New Orleans police headquarters. The two workmen also identified Barksdale. Clothing seized from Barksdale at the time of his arrest matched the victim's description of her assailant's clothes. A hammer similar to the one described by the victim was also found. Scientific tests of Barksdale's clothing revealed seminal fluid on the genital region of his garments. Furthermore, cat hair removed from Barksdale's clothing matched hair taken from the victim's bed, clothing and pet cat.

1. Barksdale's petition alleged that "[t]he State of Louisiana and the Parish of Orleans practiced a systematic exclusion of all but a token number of Negroes from the grand jury which returned the indictment charging petitioner with aggravated rape." Additionally, he alleged that "[t]he State of Louisiana and the Parish of Orleans practiced a systematic exclusion of all but a token number of Negroes from the petit jury venire from which were selected the jurors who tried petitioner and who rendered the verdict of guilty as charged."

2. The following recital of the facts of Barksdale's crime was taken from the transcript of testimony before the state criminal trial court, which was included as an exhibit to this habeas petition.

3. *Labat v. Bennett*, 365 F.2d 698, 729 (5th Cir. 1966) (Gewin, J., dissenting).

On October 5, Barksdale asked to see the arresting officers in order to make a statement. He subsequently dictated a confession that was typed out verbatim by a police lieutenant. The facts in Barksdale's statement substantially corroborate those related by the rape victim.[4]

Barksdale was indicted for aggravated rape by an Orleans Parish Grand Jury. Two of the twelve members of that jury were black. Prior to trial, counsel for Barksdale challenged the composition of the general jury venire, the grand jury venire, the petit jury venire and the grand jury itself, alleging systematic exclusion of blacks. The state trial court held a hearing to consider these contentions and developed an extensive record which included the testimony of the Chairman of the Orleans Parish Jury Commission and seven judges of the Orleans Parish Criminal District Court.[5] In addition, counsel for Barksdale and the state entered into written stipulations regarding black representation on the venires and the juries for various years. Based on this record, the court denied Barksdale's challenges.

At trial, Barksdale presented no evidence or testimony in his favor and offered no defense.[6] Indeed, except for some limited cross-examination of police officers regarding the voluntariness of the confession, counsel for Barksdale did not cross-examine the victim or other witnesses produced by the state. The accused's confession, the scientific tests, eyewitness identifications and other evidence all were admitted without objection. The jury found Barksdale guilty as charged and imposed the death penalty. The sentence was later reduced to life imprisonment.

II.  Barksdale's Appeals

Over the past seventeen years, Barksdale has resorted to every available appellate channel, alleging a variety of defects including jury discrimination. The Louisiana Supreme Court heard his first appeal, and, in a lengthy opinion, unanimously found no intentional or systematic exclusion of blacks from the jury system, noting that since *Eubanks v. State of Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), a case which reversed a murder conviction because of grand jury discrimination, "the judges of the parish have adopted a practice of jury selection in keeping with the spirit of the law announced in the *Eubanks* case." *State v. Barksdale*, 247 La. 198, 170 So.2d 374, 380 (1964). Barksdale then presented his jury discrimination claims to the United States Supreme Court, which denied certiorari, 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236 (1965). Approximately two years later, the Louisiana Supreme Court denied Barksdale's habeas petition. *State ex rel. Barksdale v. Dees*, 252 La. 434, 211 So.2d 318 (1968).[7]

In 1971, Barksdale filed a petition for a writ of habeas corpus in federal district court. The petition was originally heard by

---

4.  Barksdale's entire statement is reproduced in the dissent to the original panel opinion in this case. *United States ex rel. Barksdale v. Blackburn, supra*, 610 F.2d at 273–74 n. 2 (Ainsworth, J., dissenting).

5.  Daniel A. Knowles, Chairman of the Orleans Parish Jury Commission, testified in general regarding the construction of various jury lists, the qualification process for prospective jurors, and the procedure utilized in developing final grand and petit jury venires. There was also substantial discussion as to what information Knowles could obtain from his files regarding the racial characteristics of the jury selection process. Knowles did eventually supply information from which Barksdale and the state extracted a series of statistical stipulations.

The seven judges who testified stated that they did not intentionally exclude blacks from jury venires or grand juries, but that they affirmatively sought to avoid decreasing black representation on jury venires and panels. Virtually all of the judges testified that a disproportionately large number of blacks asked to be excused because of economic hardship.

6.  Barksdale pleaded not guilty and not guilty by reason of insanity. The insanity defense was never pursued at trial, however, and was withdrawn after closing arguments.

7.  The 1968 state habeas petition alleged systematic exclusion of blacks from the grand jury and petit jury venire. A later state habeas petition, also denied, was based on grounds not related to the present petition. *State ex rel. Barksdale v. Henderson*, 257 La. 551, 242 So.2d 886 (1971).

a federal magistrate, and, based on the magistrate's recommendations, the district court set aside Barksdale's conviction. The state's appeal was dismissed. *Barksdale v. Henderson*, No. 73–1536, *cert. denied*, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974). The state then moved to vacate the district court judgment on the ground that the hearing before the magistrate was an improper delegation of authority under *Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974). The motion was granted and affirmed on appeal, *Barksdale v. Henderson*, 519 F.2d 382 (5th Cir.), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). The case was remanded for an evidentiary hearing, and, after three such hearings,[8] the district court finally denied the petition. It found that at "the time of petitioner's trial the jury commission and the judges were not engaged in invidious racial discrimination and purposeful exclusion of blacks as a class from jury service on the grand and petit juries."

Barksdale appealed the district court ruling, and a panel of this court, with one judge dissenting, reversed, holding that Barksdale presented an unrebutted prima facie case of racial discrimination. The panel compared the black percentage of the general population of Orleans Parish in 1962 and 1963 with the percentage of blacks appearing on the general jury venire for those years and reasoned that the disparities found proved "the existence of both grand and petit jury discrimination" because "both [the] grand and petit juries were selected from the names which appeared on the general venire." 610 F.2d at 266. In addition, the panel noted that the sequence of blacks serving on grand juries from 1954 through 1963 in itself "evidences discrimination through limited inclusion." 610 F.2d at 268. The panel held that the state's justifications for the disparities were either unsupported or illegal. The state's

contention that different literacy levels for white and black jurors explained the lower level of black participation was held to be "unsupported by the record." 610 F.2d at 272. The state's contention that the remainder of the disparity was explained "in terms of the arguably benign system of excusing 'hardship' cases" was held to be unacceptable in light of *Labat v. Bennett, supra*, 365 F.2d 698. Thus, with the state "left without a legitimate non-discriminatory explanation to rebut Barksdale's prima facie case," 610 F.2d at 272, the panel set aside the conviction.

### III. Is Guilt Irrelevant?[9]

On this appeal, Barksdale raises only one issue, alleging that the jury system in Orleans Parish systematically excluded blacks from grand jury and petit jury service. Several analytical steps must be taken before this broad issue can be determined, however. Initially it must be determined whether Barksdale proved a prima facie case of jury discrimination. At issue in that determination will be not only how much of a disparity exists between the eligible black population and actual black representation on juries, but also how much of a disparity is needed to prove the case and what statistical measures of population and jury representation are appropriate. Once a prima facie case has been proved, it must be determined whether the state effectively rebutted that case. Here it will be necessary to examine whether the Orleans Parish system of excusing certain workers on request was a constitutionally permissible means of rebuttal in light of *Labat v. Bennett, supra*, and related cases.

A preliminary matter is suggested by the fact that Barksdale has never made, and could never make, any colorable claim that he is innocent of the crime for which he was

---

**8.** The first hearing was held before Judge Christenberry, who died while the case was under consideration. A second evidentiary hearing was therefore held before Judge Schwartz; he denied that petition. Barksdale moved for a new hearing because of a factual error contained in Judge Schwartz's opinion,

and the state, which introduced the error through its brief, did not oppose the motion.

**9.** Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970).

convicted. As Justice Powell stated in his concurring opinion in *Schneckloth v. Busta-monte*, 412 U.S. 218, 257–58, 93 S.Ct. 2041, 2063, 36 L.Ed.2d 854 (1973), the "central reason" for habeas corpus is "the affording of means, through an extraordinary writ, of redressing an unjust incarceration." One can legitimately question whether freeing a petitioner who is guilty beyond a reasonable doubt of a heinous crime furthers that central concern.

We are mindful, however, that recently in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), Justice Blackmun wrote in Part II of his opinion for the Court that a claim of racial discrimination in the selection of a grand jury foreman presented an issue cognizable on habeas corpus regardless of the guilt or innocence of the petitioner, and regardless of whether the state had previously granted a full and fair hearing on the petitioner's claim. This was an apparent response to speculation raised by Justice Powell in his dissent in *Castaneda* where he stated that "claims of grand jury discrimination are not cognizable on federal habeas corpus after *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037 [49 L.Ed.2d 1067] (1976)." *Castaneda v. Partida*, 430 U.S. 482, 508 n.1, 97 S.Ct. 1272, 1287 n.1, 51 L.Ed.2d 498 (1977). However, Part II of Justice Blackmun's opinion was joined by only two justices who joined in the judgment of the Court and by two dissenters (Justices White and Stevens), leading Justice Powell to question its precedential value "for not all of the four Members who join it support even the Court's judgment." *Rose v. Mitchell, supra*, 443 U.S. at 582, n.3, 99 S.Ct. at 3014 n.3 (Powell, J., concurring). Since "the holding of the Court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds," *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 2923 n.15, 49 L.Ed.2d 859 (1976), Justice Powell's point is well taken. Even if one considers Part II to be a part of the Court's holding, it may not be dispositive of this case. Justice Blackmun's opinion primarily addresses the contention of Justice Jackson, dissenting in *Cassell v. Texas*, 339 U.S. 282, 298, 70

S.Ct. 629, 637, 94 L.Ed. 839 (1950), that discrimination in grand jury selection, absent petit jury discrimination, should never result in reversal of a conviction. *Rose v. Mitchell, supra*, 443 U.S. at 552, 99 S.Ct. at 2998. It might very well still be an open question whether, in light of the facts and circumstances of a particular case, such grand jury discrimination might be harmless error. If ever there was a case in which harmless error should apply it is this one, in which the grand jury did include two blacks, in which the grand and petit jury selection occurred at a time when great progress was being made in eradicating jury discrimination in Louisiana, in which the evidence was so overwhelming that no grand jury, no matter how selected and constituted, could fail to indict, and in which no serious claim of innocence has ever been raised.

■ Whatever the precedential value of Part II of Justice Blackmun's opinion in *Rose*, it may not be the final word on the subject. As Justice Powell noted in his concurrence:

> Whenever a federal court is called upon by a state prisoner to issue a writ of habeas corpus, it is asked to do two things that should be undertaken only with restraint and respect for the way our system of justice is structured. First, as one court of general jurisdiction it is requested to entertain a collateral attack upon the final judgment of another court of general jurisdiction. Second, contrary to principles of federalism, a lower federal court is asked to review not only a state trial court's judgment, but almost invariably the judgment of the highest court of the State as well. These considerations prompt one to inquire, more critically than this Court ever has, whether it is appropriate to allow the use of habeas corpus by state prisoners who do not seek to protect their personal interest in the justness of their convictions.

*Rose v. Mitchell, supra*, 443 U.S. at 579–80, 99 S.Ct. at 3012 (footnote omitted). The use of habeas corpus to free guilty prisoners

who had a fair and accurate trial is indeed troublesome. In the present case, however, we need not rest on the inappropriateness of habeas corpus since we find that Barksdale's claims do not prevail on the merits.[10]

## IV. The Legal Issues

■ Intentional racial discrimination is the foundation of Barksdale's claim. "Recent cases have established the fact that an official act is not unconstitutional *solely* because it has a racially disproportionate impact." *Castaneda v. Partida, supra,* 430 U.S. at 493, 97 S.Ct. at 1279, *citing Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The evidence presented in this case is statistical; Barksdale has offered no proof to show that even one qualified black was excluded from jury service. Barksdale is not entitled to relief upon a mere showing of a statistical dispar-

ity between black population and black participation in the Orleans Parish jury system, but can prevail only if such a disparity "results from purposeful discrimination." *Castaneda v. Partida, supra,* 430 U.S. at 493, 97 S.Ct. at 1279.

■ Castaneda set out a definitive means of proving discriminatory intent:

Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his case or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand

---

10. Another preliminary issue, suggested in a supplemental brief filed by Barksdale but not relied upon at oral argument, is whether the state is collaterally estopped from contesting the jury discrimination issue in light of *Newman v. Henderson,* 539 F.2d 502 (5th Cir. 1976). At one point, Barksdale's habeas petition was consolidated for the purpose of an evidentiary hearing before a magistrate with that of John Newman, who alleged racial discrimination on the part of the same grand jury which indicted Barksdale. After the magistrate's hearing, the cases were separated and sent back to different district judges. Newman's conviction was eventually set aside by the Fifth Circuit.

In his brief, Barksdale relies heavily on *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), a civil case which held that the mutuality doctrine did not bar application of collateral estoppel. "Under this mutuality doctrine, neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Id.,* 439 U.S. at 326–27, 99 S.Ct. at 649 (footnotes omitted). Just last term, however, the Supreme Court held that nonmutual collateral estoppel cannot be used against the government in a criminal case. *Standefer v. United States,* 447 U.S. 10, 20–25, 100 S.Ct. 1999, 2006–08, 64 L.Ed.2d 689 (1980). While *Standefer* is not fully dispositive of the issue in a habeas corpus case, it would certainly be anomalous to maintain that nonmutual collateral estoppel does not apply at trial or direct appeal, but can be invoked on the very same issue in a habeas proceeding. In this case, as

in *Standefer,* "[t]he public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases ...." *Standefer v. United States, supra,* 447 U.S. at 25, 100 S.Ct. at 2008 (quoting from the Court of Appeals opinion). The other policy basis for estoppel—"protecting litigants from the burden of relitigating an identical issue"—carries little weight when a party not involved in the earlier judgment seeks to use estoppel offensively. *Parklane Hosiery Co. v. Shore, supra,* 439 U.S. at 326, 99 S.Ct. at 649. In *Parklane Hosiery,* the Supreme Court emphasized that courts should have "broad discretion to determine when [offensive collateral estoppel] should apply." 439 U.S. at 331, 99 S.Ct. at 651. It was not an abuse of that discretion to deny application in this case. Collateral estoppel is appropriate only when the identical issue was fully litigated in the prior case. Here, the issue is whether the jury selection system discriminated against blacks. In *Newman,* the state contended first that Newman had waived any discrimination claim by failing to object at trial and, later, that the federal court should have relied on state findings rather than hold its own evidentiary hearing. *Newman v. Henderson, supra,* 539 F.2d at 504. As this court noted, "the state does not attack the finding of the district court that there was a systematic exclusion of qualified citizens from the grand jury that indicted Newman." *Id.* Barksdale cannot now offensively use those unattacked findings.

jurors over a significant period of time.... Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports that presumption of discrimination raised by the statistical showing.... Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda v. Partida, supra,* 430 U.S. at 494–95, 97 S.Ct. at 1280. There are thus four parts of the jury discrimination test. The plaintiff must first identify a distinct class, then show a significant underrepresentation of that class, and then, finally, support that showing by demonstrating that the selection procedure is susceptible to abuse. The fourth part of the test permits the state to rebut the inference of discriminatory purpose. The test does not eliminate the need to show discriminatory intent, but merely acknowledges that "[i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Castaneda v. Partida, supra,* 430 U.S. at 494 n.13, 97 S.Ct. at 1280 n.13. This procedure does not reveal how large a disparity is required to establish a prima facie case or what statistics should be used in defining that disparity.

The Supreme Court has "never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks ...." *Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972). Nevertheless, some guidance as to the disparities necessary to raise a prima facie case can be gleaned from Supreme Court precedent. In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the evidence established that "while Negro males over 21 constitute 26% of all males in the county in this age group, only 10 to 15% of the grand and petit jury panels drawn from the jury box since 1953 have been Negroes [sic], there having been only one case in which the percentage was as high as

23%." 380 U.S. at 205, 85 S.Ct. at 827–28. The Court concluded that this was insufficient "to make out a prima facie case of invidious discrimination under the Fourteenth Amendment." 380 U.S. at 206, 85 S.Ct. at 828. While the actual disparities found in *Swain* range from 11 to 16%, the Court held that purposeful discrimination based on race alone could not be "satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." 380 U.S. at 208–09, 85 S.Ct. at 829. *See* Gewin, *An Analysis of Jury Selection Decisions,* appended to *Foster v. Sparks,* 506 F.2d 805, 828–30 (5th Cir. 1975). This circuit, in *Thompson v. Sheppard,* 490 F.2d 830 (5th Cir. 1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1974), held that the Jury Commission would not be required to recompose jury lists when there was an 11% disparity between the percentage of blacks in the total population and the percentage of blacks on the jury list.

Whether or not greater disparities constitute prima facie evidence of discrimination depends upon the facts of each case. In *Alexander v. Louisiana, supra,* 405 U.S. at 630, 92 S.Ct. at 1225, the Court found that the petitioner had established a prima facie case of discrimination because the juror "selection procedures themselves were not racially neutral" and there was a 14% disparity between the presumptively eligible black population and the actual list of prospective jurors. The Court made clear that it did not rely "on statistical improbability alone, for the selection procedures themselves were not racially neutral." 405 U.S. at 630, 92 S.Ct. at 1225. The 14% disparity was sufficient to create a prima facie case only with other evidence of discrimination. A disparity of 14% was found sufficient to establish a prima facie case in *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), in light of· the fact that no person with a Mexican or Latin American surname had ever served on a jury commission, grand jury or petit jury in the county. In other cases the Supreme Court has found prima facie cases to be established when

there were disparities of 23%, *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); 33%, *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); 25.7%, *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); and 33.5%, *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

While the above cases give some idea of the magnitude of disparity needed to establish a prima facie case, their greatest significance lies in their demonstration that there is no magic figure which proves jury discrimination. Any given disparity means little in isolation; a determination of intentional racial discrimination requires an examination of all of the facts and circumstances of a given case. The Supreme Court cases also do not reveal which statistics should be used to measure the disparities. In particular, at issue is whether general population statistics or more meaningful eligible population statistics should be used where, as here, those statistics are in the record. The inquiry is an important one—a given disparity may increase or decrease substantially depending on which set of statistics is employed.[11]

Although *Castaneda v. Partida, supra,* used general population statistics to measure racial disparities, that case should not be read to require using those figures. When *Castaneda* reached the Supreme Court, it had been tried and appealed to this circuit on the basis of general statistics. It was not until oral argument before the Supreme Court that the State of Texas contended that more narrow eligible population statistics would explain the disparity

found by the Court. *Castaneda v. Partida, supra,* 430 U.S. at 488 n.8, 97 S.Ct. at 1276 n.8. The Court proceeded on the basis of general population statistics because there were "so many implicit assumptions" in the use of the untested eligible population statistics which an appellate court could not make "without a record below in which those assumptions were tested." *Id.* In other cases, where the appropriate statistics had been developed in the record, the Court relied on statistics describing the population of blacks presumptively eligible for jury service.[12] *See, e. g., Alexander v. Louisiana, supra; Swain v. Alabama, supra; Jones v. Georgia, supra; Whitus v. Georgia, supra.*

## V. The Statistics

The district court and this court have been presented with a multitude of statistics which attempts to describe the Orleans Parish jury system as it existed almost two decades ago. Most of the statistics were proposed by Barksdale's expert, Dr. Levine, or stipulated to by counsel during either the district court hearing or the state court proceedings. The state, for its part, generally accepted the statistics proposed by Barksdale, although on appeal the state argued in its original brief an even more favorable view of the statistics than that taken by the district court.[13] While we do not decline to join the statistical fray, this case proves the danger of uncritical deference to statistics. In the absence of any clear guidelines, persuasive figures can be found to support as well as to undermine the finding of a prima facie case of discrim-

11. For example, in this case the general population of Orleans Parish in 1963 was found by the district court to be 39.5% black. The male population aged 21–64 in the same period was 34.4% black, substantially lower.

12. Chief Justice Burger, dissenting in *Castaneda v. Partida, supra,* 430 U.S. at 504, 97 S.Ct. at 1285, wrote that "[t]he decisions of this Court suggest, and common sense demands, that *eligible* population statistics, not gross population figures, provide the relevant starting point." (emphasis in original)

13. The panel majority opinion criticized the state for changing "its explanation of the statis-

tics between the time it proposed findings of fact to the district court and the filing of its brief in this court." 610 F.2d at 256. The state, on the basis of the 1960 census, did indeed urge in its appellate brief a view of the statistics more favorable to its case than those adopted by the district court. The state's position in this regard is clear—it was defending the district court's denial of habeas corpus relief, and in order to demonstrate the reasonableness of that result, the state attempted to demonstrate that there was a more supportive view available in the record.

ination. Depending on the figures compared, the disparity between the actual black participation in the juries and venires and presumptively eligible population may be as small as 4.34%[14] or as great as 25.2%.[15] But neither of these figures has any meaning unless the facts of this case are examined as a whole. The task of this court is first to determine whether the conglomeration of statistics presented conclusively shows intentional racial discrimination, and then to determine whether the state has effectively rebutted that showing.

■ Our analysis differs radically from that of the panel majority. First, we find that statistics describing the presumptively eligible black juror population, rather than the general black population, provide the proper starting point for an inquiry into racial disparities in the Parish. Statistics describing the percentage of black males of jury age were provided by Barksdale and the state. Further information regarding the presumptively eligible black population is readily obtainable from the 1960 census figures which Barksdale himself offered in

evidence before the federal district court. Second, our analysis places considerably greater emphasis on certain statistics stipulated to by both Barksdale and the state before the state trial court and the district court.

### A. The Eligible Population

Barksdale contends that he was indicted by a grand jury and convicted by a petit jury from which blacks were systematically excluded. To assess the merits of this claim, it is necessary to first determine the percentage of the population eligible for grand jury service attributable to blacks, and then to determine the percentage of black jurors and veniremen. According to the statute in effect in 1962, compulsory jury service was limited to males at least 21 years old.[16] Jurors had to be literate in English, a resident of the Parish for one year prior to service, and neither under indictment for a crime nor convicted of a felony. In addition, certain persons were occupationally exempt from service.[17]

14. The disparity between eligible black males with at least seven years of education (26.2%) and the stipulated final petit jury venire for 1963 (21.86%).

15. The disparity between the general black population in 1963 (39.5%) and the percentage of blacks on the 1964 grand jury venire as calculated by the panel majority (14.0%).

16. Women were not compelled to serve on juries but could volunteer for jury service by filing written declarations of desire to serve. L.S.A.–R.S. 15:172.1.

17. The qualifications and exemptions from jury service were established in L.S.A.–R.S. 15:172, 174:

§ 172. Qualifications
The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows:
To be a citizen of this state, not less than twenty-one years of age, a bona-fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color, or previous condition of servitude; and provided further, that the district judge shall have

discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.
In addition to the foregoing, jurors shall be persons of well known good character and standing in the community.
§ 174. Persons exempt from jury service
The following persons shall be exempt from serving as grand or petit jurors, but the exemption shall be personal to them and when they do not themselves claim exemption, it shall not be sufficient cause for challenging any person exempt under the provisions of this article:

. . . . .

(3) Judges and active officers of the several courts of this state, attorneys-at-law, physicians, surgeons, and dentists actively engaged in the practice of their profession and duly licensed under the laws of this state, professors and school teachers, school bus drivers, apothecaries, and all members of paid fire departments, and all commercial travelers, residing in the state who are actually engaged in travelling, either for themselves or in the interest of wholesale dealers, commission merchants or manufacturers.
(4) All persons over sixty-five years of age, those who from sickness or other physical

Neither the census nor any other source presented to the court contains statistics detailed enough to calculate the exact racial breakdown of the population meeting these statutory criteria. In order to approximate the black percentage of the eligible population, Barksdale's expert, using a complicated mathematical formula called the Three-Point LeGrangian Interpolation,[18] estimated the black male population of Orleans Parish as of 1962 and 1963. He then adjusted that figure to eliminate the estimated proportion of the group which was illiterate or occupationally exempt.

■ In addition to our reluctance to condemn the state's jury system on the basis of mere estimates, there are several reasons why we do not accept the approximations of Barksdale's expert. First of all, the use of 1962 figures ignores the fact that potential jurors had to reside in the Parish for at least one full year before they become eligible for jury service. In addition, the jury wheel is not totally emptied and replaced at any one time, but instead new names are added as the old ones are used. Thus the population of eligibles on the wheel would normally include some names which had been on it for several months. Furthermore, the city directory, from which the names of jurors were selected, certainly did not add all new residents instantaneously.[19] For these reasons, the appropriate date to measure the composition of the jury-eligible population must be well over a year prior to 1962, and we therefore use the more precise figures of the 1960 census rather than 1962 approximations.[20]

■ Second, Barksdale's expert seems to have been overzealous in his adjustment of the eligible population on account of occupational exemptions. His adjustments eliminated all persons categorized as "Salesmen and Sales Clerks" in all but the retail trade. This is certainly a much broader category than the statutory exemption for "commercial travelers." In the absence of any exact figure for that exemption, we cannot adjust for the "commercial traveler" exemption, and will limit our occupational adjustments to the other categories listed in the statute, specified in the census, and included in the adjustments made by Barksdale's expert.[21] Finally, while Barksdale's expert does calculate the proportions of the population with fifth-, sixth- and seventh-grade education as a substitute for the literacy and knowledge requirements for jury service, he emphasizes the fifth-grade figure in making his comparisons. We see no reason to declare erroneous the Louisiana Supreme Court determination that a seventh-grade education approximates the qualifications needed for jury service, *State v. Barksdale, supra*, 170 So.2d at 382–83, especially in light of the fact that in addition to simple literacy, a juror was required to "understand the duties and obligations of citizenship under a republican form of government."[22] We therefore use a sev-

---

infirmity may be incapacitated from rendering such service, and those who have served as grand jurors under the provisions of this article during the previous six months, and those who have served as petit jurors as herein provided, who shall not again be called as jurors until the expiration of one year from the date of their service.

(5) All telegraph and telephone operators and railroad station agents. Also chief engineers of electric and water works systems.

**18.** The formula for the Three-Point LeGrangian Interpolation is set out in the panel opinion, 610 F.2d at 226 n.20.

**19.** No claim has been made that the use of the city directory itself is discriminatory.

**20.** The decennial census is normally counted as of April 1 of the year, although recounting and refinement of the count continues for some time thereafter. *See generally* Preface, 1960 Census of Population (Part 20, Louisiana) at iii; *see also Young v. Klutznick*, 497 F.Supp. 1318 (E.D.Mich.1980).

**21.** It might, in fact, be statistically sounder practice not to adjust for these exemptions at all since, by statute, they are "personal" and need not be taken. Some of the exempt group would likely be paid by their employer if they served and would be interested in serving.

**22.** L.S.A.–R.S. 15:194 required that jurors have "the qualifications requisite to register as voters." L.S.A.–R.S. 18:31 required that voters "understand the duties and obligations of citizenship under a republican form of government." It is interesting to note that under

enth-grade education figure to approximate the literacy and knowledge requirements for jury service, although we also calculate an estimate of the eligible population with a sixth-grade education. We find the following estimates of the presumptively eligible black population to be the most appropriate: [23]

|  | Seventh Grade | Sixth Grade |
|---|---|---|
| Percentage of Blacks in Eligible Population | 26.31% | 28.16% |

These statistics will be compared below to the percentage of blacks on the grand jury, the grand jury venire and the petit jury venire.

**B. The Racial Composition of the Grand Jury and the Grand Jury Venire**

■ There has been great dispute between the parties over the racial breakdown of the persons who were included in the jury venire. We therefore compare a variety of jury and venire participation figures to the eligible population statistics. At trial, the parties appear to have stipulated that 19.43% of the persons on the jury wheel as of January 1, 1962, were black.[24] This figure presumed that all persons of undetermined race were black, a presumption with some support in the record.[25] The parties at one point sampled thirteen of a group of undetermineds, and found that seven were black, leading to an alternative presumption that 50% of the undetermineds were black.[26] Using that presumption, 16.64% of the persons on the jury wheel as of January 1, 1962, were black. Finally, two out of the twelve persons on the grand jury which indicted Barksdale, as well as the three previous grand juries, were black, yielding a black percentage of 16.67%. These figures for grand jury and venire participation compare to the previously derived figures for eligible population as follows:

**SEVENTH–GRADE EDUCATION**

|  | Stipulation, Undetermined All Black * | Stipulation, Undetermined 50% Black ** | Actual Grand Jury Participation |
|---|---|---|---|
| Percentage of Eligible Blacks in the Eligible Population | 26.31% | 26.31% | 26.31% |
| Percentage of Blacks on Jury or Jury Venire | 19.43% | 16.64% | 16.67% |
| Disparity | 6.88% | 9.67% | 9.64% |

federal voting rights law, a sixth-grade education is required to create a presumption of literacy. 42 U.S.C. § 1971(c).

**23.** These percentages were calculated using figures from Tables 4, 7, and 8 of the report of Dr. A. Levine, Barksdale's expert witness (Plaintiff's Exhibit B), and Table 96 of the 1960 Census. See the statistical appendix, *supra*, for the exact calculations.

**24.** The stipulation states in pertinent part:
23. According to the return to the Subpoena Duces Tecum issued to the Jury Commission out of 607 names in the jury wheel as of January 1, 1962, 118 or 19.43% were Negroes.
A. Note that the figure 118 includes a category called indeterminate in which there were 34 persons.
The Louisiana Supreme Court adopted the 19.43% figure in its opinion. 170 So.2d at 382. This figure may be questioned because of the presumption that all undetermineds were black, and we therefore also recalculate the percentage by assuming that 50% of the undetermined were black.

**25.** Apparently the most common reason for not being able to determine race was that many people filled in the blank for race on their jury subpoena with the letter "C." At one point in the pretrial hearing on the motion to quash the indictment, Barksdale's attorney requested "the court to take judicial cognizance that when 'C' is used it is for colored. ... Of course, any cards in the file that had a 'C' would indicate that that meant colored.... Any white person is not going to take a chance and put a 'C' on his card." State Court Record, Vol. II, Defendant's Exhibit D–8, at page 175.

**26.** The stipulation is contained in Volume 3 of the Record on Appeal at R–378.

**SIXTH–GRADE EDUCATION**

| | Stipulation, Undetermined All Black * | Stipulation, Undetermined 50% Black ** | Actual Grand Jury Participation |
|---|---|---|---|
| Percentage of Eligible Blacks in the Eligible Population | 28.16% | 28.16% | 28.16% |
| Percentage of Blacks on Jury or Jury Venire | 19.43% | 16.64% | 16.67% |
| Disparity | 8.73% | 11.52% | 11.49% |

\* Trial stipulation which assumed all persons of undetermined race were black.
\** Trial stipulation adjusted to assume that only 50% of persons of undetermined race were black.

In light of the cases discussed, *supra*, in which the United States Supreme Court held that a prima facie case could not be "satisfactorily proved by showing that an identifiable group in a community is under-represented by as much as 10 percent," we find that Barksdale has failed to prove a prima facie case of grand jury discrimination. We acknowledge that the Supreme Court has given no clear guidelines as to what disparity proves a prima facie case. However, in this case the disparities offered to prove a prima facie case of jury discrimination are razor thin; such proof may be easily rebutted.

C.  The Statistics for the Petit Jury Venire

■  While there has been some disagreement between the parties as to which petit jury venire statistics are appropriate, the parties stipulated that the final petit jury venire for 1963, the year of Barksdale's trial, was 21.86% black.[27] This figure presumes that only 32% of the undetermineds were blacks, so it cannot be criticized on the same basis as the grand jury venire stipulation of 19.43% black, which presumed that all undetermineds were black. This final petit jury venire figure compares with the eligible population statistics as follows:

27.  This stipulation is contained in Volume 5 of the Record on Appeal, at pages 921–24. It was designated "Stipulation D" by the district court.

| | Eligible Population, Seventh-Grade Education | Eligible Population, Sixth-Grade Education |
|---|---|---|
| Percentage of Eligible Blacks in the Eligible Population | 26.31% | 28.16% |
| Percentage of Blacks in the Final Petit Jury Venire | 21.86% | 21.86% |
| Disparity | 4.45% | 6.30% |

Clearly, these disparities are insufficient to prove a prima facie case.

D.  The Sequence of Grand Juries

■  Apart from the statistical disparities discussed above, Barksdale relies on the sequence of blacks actually serving on Orleans Parish grand juries to prove his discrimination claim.[28] Barksdale's expert testified that the sequence of black grand jurors serving from September 1958 to September 1962 had such a low probability of occurring by chance as to be "non-random." The state's expert utilized different statistical tests to arrive at his conclusion that the sequence was consistent with a hypothesis of randomness. The district court came to

28.  The number of blacks on each grand jury from September 1958 to September 1962 was as follows: 2, 2, 2, 2, 1, 2, 2, 2, 2.

a conclusion we cannot deem erroneous: "Faced with totally opposing views of competent and qualified experts, this Court finds that the petitioner as to the grand jury has failed to carry his burden of proving invidious racial discrimination based on statistical improbability alone." Moreover, even if accepted, the contention of Barksdale's expert that the grand jurors were not selected randomly proves nothing about racial discrimination. Of course Parish grand jurors were not randomly selected; it is not so contended by the state. The grand jury was selected conscientiously and nonrandomly by the judges of the Orleans Parish Criminal District Court, pursuant to Louisiana statute. The judges testified that they sought to select the best qualified jurors from a venire that, according to Louisiana law, was composed only of citizens possessing specified levels of competence. These same judges testified that, while they did not intentionally exclude blacks from the grand jury, they sought to avoid reducing black representation from the jury venire to the actual grand jury. Presented with a venire in 1962 that was between 16.64 and 19.43% black, it is not surprising that a judge who sought to avoid reduction in black participation would select two black grand jurors on a twelve-man jury. Several of the judges testified that they had to make special efforts to find at least two blacks who were eligible to serve and did not have to be excused because of occupation or hardship. This court should be especially careful not to ascribe invidious motivations to a group of judges who, as noted by the panel majority, were not taking race into account "when they granted excuses in order to reduce the proposed petit venire to the final petit venire." 610 F.2d at 268. Unfortunately, neither expert squarely addressed the key question: does the sequence of grand juries conclusively prove that the jury selection process intentionally excluded blacks from the grand juries? The answer to that question must be no, because the concept of nonrandomness is every bit as consistent with nonrandom efforts to *in-clude* blacks as it is with efforts to *exclude* blacks.

### VI.   The State's Rebuttal Evidence

Since we find that Barksdale has not proven a prima facie case of jury discrimination, the state's rebuttal evidence may seem to be superfluous. But we hold, as an alternative grounds for our decision, that even assuming, *arguendo*, that Barksdale did meet his initial burden, the state adequately rebutted his case.

There is extensive testimony in the record by judges of the Parish criminal courts and representatives of the Jury Commission regarding the juror selection procedure. Such testimony has considerable importance. *Castaneda v. Partida, supra,* 430 U.S. at 488 n.8 & 498–99, 97 S.Ct. at 1276–77 n.8 & 1282; *Swain v. Alabama, supra,* 380 U.S. at 207 n.4 & 209, 85 S.Ct. at 829 n.4 & 830. The judges testified that they did not intentionally include or exclude blacks from the jury venires or the grand or petit juries, but that a disproportionately large number of blacks asked to be excused because of economic hardship. The stipulated testimony of the Jury Commission shows that "an exceedingly large number of the Negro males who appear before the Jury Commissioners disqualify themselves for jury service by stating either that they cannot read or write or that they have had only a very small amount of formal schooling, or by showing that they are self-employed or that their employers will not excuse them from work and will not pay them their wages if they serve on a jury . . . ." While simple protestations "of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion," *Alexander v. Louisiana, supra,* 405 U.S. at 632, 92 S.Ct. at 1226, the assertions by the judges and Jury Commissioners of Orleans Parish are strongly corroborated by other evidence in the record. The 1960

census figures introduced into evidence by Barksdale and summarized in the following table show that 70.8% of black males in Orleans Parish earned less than $3,000 per year, while only 35.9% of the white population earned this little; 93.6% of black men had annual incomes of $4,999 or less, compared with 59.5% of whites.

| | Total | Number With No Income or With Income of $2,999 or Less | Percent | Number With No Income or With Income of $4,999 or Less | Percent |
|---|---|---|---|---|---|
| Black Males, 14 and Over | 76,222 | 53,944 | 70.8 | 71,339 | 93.6 |
| White Males, 14 and Over | 202,283 | 72,668 | 35.9 | 120,272 | 59.5 |

Source: Bureau of the Census, 1960 Census of Population (Part 20, Louisiana), Table 133.

---

Thus, the assertions by the judge and jury commissioners that blacks were underrepresented because they requested to be excused for economic hardship cannot be dismissed as mere ad hoc rationalization designed to camouflage invidious discrimination.

▮ The panel opinion dismissed the state's explanations for the racial disparities as either unsupported by the record or foreclosed by this court's opinion in *Labat v. Bennett, supra.* We emphatically disagree. As previously shown, use of statistics describing the educational level of prospective black jurors substantially reduces the disparity between eligible black jurors and those actually serving on Orleans Parish jury venires. Thus, the differing literacy levels of prospective white and black jurors cannot be dismissed as a partial explanation for reduced black jury participation. Furthermore, the Jury Commission's practice of granting hardship excuses to prospective jurors cannot be dismissed as being itself unconstitutional. *Labat v. Bennett, supra,* is not applicable to the facts of this case. *Labat* held that the exclusion of *all* daily wage earners as a class from jury service violated the Constitution.[29] Similarly, *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), is not analogous; in that case, as in *Labat,* the Jury Commission "deliberately and intentionally excluded from the jury lists all persons who work for a daily wage." 328 U.S. at 221, 66 S.Ct. at 986. The district court in this case specifically found that the Jury Commission did not exclude the entire class of daily wage earners. The panel opinion and the litigants appear to agree that about one third of those who were called to appear before the Jury Commission were black, so there was no discrimination at that stage.[30] Then, in personal appearance before the Commission members, the uncontroverted evidence is that workers were excused for economic hardship only on request. Neither *Labat* nor *Thiel* can be read so as to proscribe the benign, and in many cases certainly beneficent, practice of excusing

29. Since we decide that the present case is not governed by *Labat,* we need not address the appellant's contention that *Labat* should not be given retroactive effect.

30. The district court concluded that not all wage earners were excluded in part on the basis of its own sample: "Although the Court did not canvas [sic] the entire [city] directory, a reading of just the 'A's' reveals twenty-eight 'wage-earners' who were sent notices for jury duty." (footnote omitted)

from jury service those persons on whom it would impose an intolerable economic burden. "It is clear that a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship." *Thiel v. Southern Pacific Co., supra*, 328 U.S. at 224, 66 S.Ct. at 987. *See also* 28 U.S.C. § 1863 (permitting excuses for "undue hardship").

## VII. Conclusion

The district court did not err in finding that the petitioner, Bruce Barksdale, failed to prove a prima facie case of jury discrimination. Clearly Barksdale failed to prove his case. A fair and reasonable assessment of the statistics shows disparities far too low to support a finding of jury discrimination. Moreover, the rebuttal evidence is valid and clearly demonstrates that the disparities found are not attributable to racial discrimination. Accordingly, the decision of the district court denying the writ of habeas corpus is

AFFIRMED.

### STATISTICAL APPENDIX

#### I. 1960 POPULATION—ORLEANS PARISH

Source: 1960 Census, Part 20 (Louisiana) [hereinafter "1960 Census"], Table 20 & Table 96

| | |
|---|---|
| Nonwhite males: | 50,412 |
| Percentage of nonwhites estimated to be nonblack (from Table 96; assumes that same percentage of nonwhites who are nonblack in ages 20–64 applies for ages 21–64): | 1.1% |
| Estimated black, male population aged 21–64 (50,412 reduced by 1.1%) | 49,857 |
| Total Male Population, ages 21–64 | 154,621 |
| Black Percentage: | 32.2% |

#### II. OCCUPATIONALLY EXEMPT POPULATION, PERCENTAGE

Source: 1960 Census, Tables 20, 122.

| Occupation | Total | White | Black |
|---|---|---|---|
| Judges and Lawyers | 1475 | 1471 | 4 |
| Physicians and Surgeons | 1515 | 1464 | 24 |
| College Presidents, Professors, etc. | 883 | 836 | 43 |
| Dentists | 380 | 363 | 17 |
| Pharmacists | 443 | 384 | 54 |
| Firemen | 996 | 996 | 0 |
| Teachers | 1453 | 992 | 531 |
| TOTAL | 7145 | 6436 | 673 |
| Total Male Population, Ages 21–64 | 214,039 | 156,577 | 56,830 * |
| Percent Exempt | 3.34% | 4.11% | 1.18% |

\* Nonwhite population in Table 20, reduced by 1.1% to adjust for proportion of nonwhites who are nonblack.

#### III. YEARS OF SCHOOL COMPLETED

Source: Levine Report, Tables 5–8

##### SEVENTH GRADE

| | Total | White | Nonwhite | Black * |
|---|---|---|---|---|
| Males 25-64 | 106,573 | 79,850 | 26,723 | 26,429 |
| Males 21-64, in school | 2,826 | 2,319 | 507 | 501 |
| Males 21-64, not in school | 10,347 | 6,420 | 3,927 | 3,884 |
| TOTAL | 119,746 | 88,589 | 31,157 | 30,814 |

##### SIXTH GRADE

| | Total | White | Nonwhite | Black * |
|---|---|---|---|---|
| Males 25-64 | 115,187 | 84,389 | 30,798 | 30,459 |
| Males 21-64, in school | 2,866 | 2,347 | 519 | 513 |
| Males 21-64, not in school | 10,771 | 6,601 | 4,170 | 4,124 |
| TOTAL | 128,824 | 93,337 | 35,487 | 35,096 |

\* Nonwhite population reduced by 1.1% to adjust for proportion of nonwhites who are nonblack.

#### IV. RACIAL BREAKDOWN OF THOSE ELIGIBLE FOR JURY SERVICE

Source: Tables above

| | SEVENTH GRADE | | SIXTH GRADE | |
|---|---|---|---|---|
| | Total | Black | Total | Black |
| Males 21-64 | 119,746 | 30,814 | 128,824 | 35,487 |
| Percent Exempt by Occupation | 3.34% | 1.18% | 3.34% | 1.18% |

IV. RACIAL BREAKDOWN OF THOSE ELIGIBLE FOR JURY SERVICE

Source: Tables above

| | SEVENTH GRADE | | SIXTH GRADE | |
|---|---|---|---|---|
| | Total | Black | Total | Black |
| Number Not Exempt | 115,746 | 30,450 | 124,521 | 35,068 |
| Percent of Eligibles Who Are Black | 26.31% | | 28.16% | |

KRAVITCH, Circuit Judge, with whom GODBOLD, Chief Judge, ALVIN B. RUBIN, FRANK M. JOHNSON, Jr., POLITZ, HATCHETT, R. LANIER ANDERSON, III, RANDALL, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges, join, dissenting:

This case presents a single issue: whether in the district court appellant proved an unrebutted prima facie case of racial discrimination in the selection of the grand jury and petit jury which respectively indicted and tried him. The majority concludes appellant failed to prove such a case. I disagree.

I.

The majority opinion, prior to addressing the merits of the jury discrimination claim, discusses a collateral issue: whether the claim is cognizable. The majority describes the crime in explicit detail, emphasizes that the claim is not guilt related, and zealously advocates that habeas relief be limited to those making a colorable claim of innocence. That issue, however, is not before us. This is not a case of first impression which we would be free to decide based upon our interpretation of the Constitution. On the contrary, during the pendency of this appeal, the Supreme Court determined this precise issue adversely to the position urged by the majority. In *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Court held that claims of racial discrimination in the selection of members of a state grand jury are cognizable in federal habeas corpus, notwithstanding that guilt was established beyond a reasonable doubt at a trial free from constitutional error.[1] The law thus has been established by our highest judicial tribunal, and we, as members of a lower court, are bound by Supreme Court precedent,[2] regardless of personal views.[3] To continue to espouse in

1. In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court denied federal habeas relief for state prisoners raising claims based on the Fourth Amendment exclusionary rule. In *Rose* the Court specifically declined to extend this limitation to a claim of grand jury discrimination. The Court stated:

[W]e conclude that a claim of discrimination in the selection of the grand jury differs so fundamentally from application on habeas of the Fourth Amendment exclusionary rule that the reasoning of *Stone v. Powell* should not be extended to foreclose habeas review of such claims in federal court.... [T]here are fundamental differences between the claim here at issue and the claim at issue in *Stone v. Powell*.... [W]e note that the constitutional interests that a federal court adjudicating a claim on habeas of grand jury discrimination seeks to vindicate are substantially more compelling than those at issue in *Stone*. As noted above, discrimination on account of race in the administration of justice strikes at the core concerns of the Fourteenth Amend-

ment and at fundamental values of our society and our legal system....

443 U.S. at 560–64, 99 S.Ct. at 3002.

2. The *Rose* opinion, written by Justice Blackmun, consisted of Part I: facts; Part II: that the claim was cognizable; and Parts III and IV: that petitioner failed to prove an unrebutted prima facie case of jury discrimination. Two Justices, Brennan and Marshall, concurred in all four parts of the opinion of Mr. Justice Blackmun. Four Justices, Burger, Powell, Rehnquist and Stewart, by two separate opinions, concurred in the judgment but disagreed with Part II. The remaining Justices, Stevens and White, dissented from the judgment denying habeas, but specifically concurred in Part II. Thus, five Justices held the claim to be cognizable. For a discussion of *Rose* as precedent, *see* The Supreme Court 1978 Term, 93 Harv.L.Rev. 60, 199–209 (1979).

3. The majority quotes extensively from Judge Friendly for the proposition that habeas relief should be available only for those who make a colorable claim of innocence. *See* Friendly, *Is*

judicial opinion a position so recently rejected by the Supreme Court is irrelevant and inappropriate.

## II.

Appellant was indicted by the September 1962 Orleans Parish grand jury and tried and convicted in July 1963. He first raised the issue of jury discrimination prior to trial and has pursued it through state and federal courts since.[4] This appeal is from the decision of the federal district court which, after an evidentiary hearing, denied his claim.

As the majority indicates, the Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) established the guidelines for proving a case of jury discrimination.[5] To make out

---

*Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970).

Legal scholars have presented compelling arguments both pro and con on this issue. *See generally, Kaufman v. United States*, 394 U.S. 217, 231, 89 S.Ct. 1068, 1076, 22 L.Ed.2d 227 (1969) (Black, J., dissenting); K. Popper, *Post Conviction Remedies in a Nutshell* (1978); Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L.Rev. 441 (1963); Boyte, *Federal Habeas Corpus After Stone v. Powell: A Remedy Only for the Arguably Innocent?*, 11 U. of Richmond L.Rev. 291 (1977); Note, *Guilt, Innocence, and Federalism in Habeas Corpus*, 65 Corn.L.Rev. 1123 (1980); Comment, *Federal Habeas Corpus: The Relevance of Petitioner's Innocence*, 46 U.Mo.K.C.L.Rev. 382 (1978).

4. The panel opinion in this case, 610 F.2d 253 (1980), gives a complete procedural history:

Barksdale appealed his conviction, again challenging the composition of the grand and petit juries. The Louisiana Supreme Court affirmed the conviction, reasoning that educational and economic factors explain the disparity between the number of black males in the population and the number of blacks appearing on the jury wheel. *State v. Barksdale*, 247 La. 198, 170 So.2d 374, 381 (1964), *cert. denied*, 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236 (1965).

Relying partially on this court's decision in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), Barksdale next pursued state habeas corpus. Again, the Louisiana Supreme Court denied his petition, *State ex rel. Barksdale v. Dees*, 252 La. 434, 211 So.2d 318 (1968). Three years later Barksdale filed a petition in federal court for a writ of habeas corpus. His case was consolidated with that of John Newman for the purpose of an evidentiary hearing before a United States magistrate. After the hearing before the magistrate, the cases were separated and sent back to the judges to whom the cases initially had been assigned. The convictions of both Newman and Barksdale were set aside. The State appealed the decision in the *Newman* case, but did not immediately do so in the *Barksdale* case. The

decision of the district court in the *Newman* case was affirmed. *Newman v. Henderson*, 539 F.2d 502 (5th Cir. 1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977).

Four months after the district court's decision in the *Barksdale* case, the State requested permission, which was granted, to file a belated notice of appeal. That appeal was dismissed by this court upon motion of Barksdale. *Barksdale v. Henderson*, No. 73–1536, *cert. denied*, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974). Meanwhile the State moved to vacate the original judgment in accordance with Federal Rules of Civil Procedure Rule 60(b)(4) on the ground that the hearing before the magistrate was an improper delegation of authority under *Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2482, 41 L.Ed.2d 879 (1974). The motion was granted and appealed unsuccessfully by Barksdale, *Barksdale v. Henderson*, 510 F.2d 382 (5th Cir.), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975).

An evidentiary hearing was held by District Judge Christenberry, who died while the case was under consideration. Upon agreement of the parties, another evidentiary hearing was held before Judge Schwartz. As he had done at the previous hearing, Barksdale presented the testimony of Dr. Arnold Levine, a statistician, and Julian Murphy, a jury commission employee. The State, for the first time, introduced the testimony of Dr. David Smith, a statistician, to rebut in part the testimony of Dr. Levine. The court denied the petition for habeas corpus.

Because of a factual error committed by the district court, Barksdale moved for and was granted a new hearing. At this hearing additional evidence was introduced both by the State and by Barksdale. The district court again denied the petition for habeas relief. It is from that order that the petitioner appeals to this court.

5. In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The

a prima facie case the petitioner must show: (1) the group allegedly underrepresented is a recognizable, distinct class;[6] (2) the group is underrepresented by comparing the proportion of the group in the total population with the proportion in the jury venire over a period of time; (3) the selection system is susceptible of abuse or is not racially neutral. The burden then shifts to the state to rebut the prima facie case by explaining the alleged disparity.

### III. *The Prima Facie Case*

### A. *The Statistical Evidence*

The district court made extensive findings of fact as to the statistical evidence of underrepresentation. The court found, *inter alia*:

In 1962 blacks constituted 38.8% of the Orleans Parish population.

In 1963 blacks constituted 39.5% of the Orleans Parish population.

In 1962 blacks constituted 33.7% of the male population aged 21 through 64.

In 1963 blacks constituted 34.4% of the male population aged 21 through 64.

The disparity between the presumptively eligible population and black males of 21–64 in 1962 (33.7%) and the grand jury venire (14.9%) of January, 1962 is 18.8%.

The disparity between the presumptively eligible population of black males of 21–64 in 1962 (33.7%) and the final petit jury venire in 1962 (13.9%) is 19.8%.

The disparity between the presumptively eligible population of black males 21–64 in 1963 (34.4%) and the final petit jury venire in 1963 (21.8%) is 12.6%.

The disparity between the percentage which blacks constituted of the persons from whom the jury list was drawn and the percentage which blacks constituted of the jury list which was thereafter compiled is 17.1%. (32%–14.9%)

The 32% figure in the last finding was derived by taking literacy into account, using fifth grade education statistics.[7]

The district court did not explicitly conclude whether, based upon its findings of fact, appellant had presented a prima facie case. Rather, it denied relief because, "assuming arguendo that the disparities did present a prima facie case," it *concluded* that the evidence adduced by the state, that the jury commission and the judges at the time of appellant's indictment and trial were making "a sincere effort," adequately explained and justified the disparities.

A careful reading of the record reveals that the major portion of the findings of the trial court were stipulated to by the parties. When the state and appellant disa-

---

first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas*, 347 U.S. [475] at 478–479 [74 S.Ct. 667 at 670–671, 98 L.Ed. 866]. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. *Id.*, at 480 [74 S.Ct. at 671]. See *Norris v. Alabama*, 294 U.S. 587 [55 S.Ct. 579, 79 L.Ed. 1074] (1935). This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. *Hernandez v. Texas*, 347 U.S., at 480 [74 S.Ct. at 671]. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington v. Davis*, 426 U.S. [229] at 241 [96 S.Ct. 2040, at 2048, 48

L.Ed.2d 597]. *Alexander v. Louisiana*, 405 U.S. [625] at 630 [92 S.Ct. 1221 at 1225, 31 L.Ed.2d 536]. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case. 430 U.S. at 494–95, 97 S.Ct. at 1280.

**6.** That blacks are a recognizable, distinct class, capable of being singled out for different treatment under the law is not disputed.

**7.** Although neither side presented any evidence at trial as to the degree of education necessary to comply with the literacy prong of the Louisiana statute for jury qualifications, *see* note 10 *infra*, this circuit in *Labat v. Bennett*, 365 F.2d 698, 728 (5th Cir. 1966), and again in *Newman v. Henderson*, 539 F.2d 502 (5th Cir. 1976), used five years of education as a criterion of literacy. Obviously, the district court adopted this standard.

greed on a proposed finding, the trial court uniformly accepted the state's proposal. We *must*, therefore, accept the findings as not clearly erroneous. *A. Duda & Sons Coop. Assn. v. United States*, 504 F.2d 970 (5th Cir. 1974).

The disparities as found by the district court, together with the selection method used (discussed *infra*), were more than sufficient to establish a presumption of racial discrimination. In prior decisions the Supreme Court has indicated prima facie cases were proved upon showing disparities of 23%, *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), 33%, *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), 25% and 33%, *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), and 14%, *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). These percentages represent the disparities between the percentage representation of the group in question in the *general* population and its representation in the jury system.[8] Thus, when comparing percentages of the relevant group in the general population to its representation in the jury system, disparities of 14%, *Hernandez v. Texas, supra,* and greater have been held to raise a presumption of intentional discrimination.

Where a narrowed population has been considered, the impermissible disparity also has been as low as 14%. For example, when the names appearing on the tax digest were used, the Court held unacceptable disparities of 18%, *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); 14.7%, *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967);[9] and 19.7%, *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967). In *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct.

1221, 31 L.Ed.2d 536 (1972), using population statistics narrowed to the jury aged population, the court held that a 14% disparity, combined with evidence that the selection process was not racially neutral, established a prima facie case.

In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), as the majority points out, the Supreme Court held that a 10% disparity between the percentage of blacks in the male population over the age of 21 and the percentage of blacks on jury venires over a period of years was not sufficient alone to prove a prima facie case where there was no proof of racial discrimination in the selection process.

The majority does not and cannot dispute that, based upon these decisions, disparities in the range of 17–20%, as found by the trial judge, in a system not racially neutral, raise a presumption of invidious discrimination and require the state to come forward with rebuttal evidence. Nevertheless, the majority concludes that appellant failed to prove a prima facie case. It reaches this conclusion by completely ignoring the district court's findings of fact as to the relevant percentages of blacks in both the eligible population and in the jury venire for the decisive years. Instead, percentages based upon a formulation never introduced or considered at trial debut across the pages of an appellate opinion. Understandably, these substituted figures create much smaller disparities than do the findings of the district court.

Nowhere does the majority opinion declare the district court's findings "erroneous"; it simply ignores them. Our standard of review mandates that we accept the findings of fact of the district court unless

---

**8.** A Fifth Circuit case, *Muniz v. Beto*, 434 F.2d 697 (5th Cir. 1970), indicated a prima facie case had been proved upon a showing of a 12% disparity between the percentage of Spanish surnamed individuals in the general population and the percentage which served on fifty successive grand juries.

**9.** The majority in conceding that the Supreme Court had found evidence of discrimination in

*Whitus* and *Jones* states that the disparity in these cases was 33.5% and 25.7% respectively. The percentages used by the majority are misleading in that they reflect the percentages of the group in the general population whereas in each case the Court based its decision upon the disparity found in the *narrowed* population (those names appearing on the tax digest).

we specifically reject them as clearly erroneous. *Wade v. Mayo,* 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); *Baker v. Metcalfe,* 633 F.2d 1198 (5th Cir. 1981); *United States v. Cruz,* 581 F.2d 535, 541 (5th Cir. 1978); Fed.R.Civ.P. Rule 52. For an appellate court to disregard totally the trial court's findings and instead base its conclusion upon findings of its own is impermissible and antithetical to the process of appellate review. Furthermore, where as here, the trial court's findings are based upon stipulated facts, they *must* be accepted. Refusal to do so flies in the face of established precedent. As we stated in *A. Duda & Sons Coop. Assn. v. United States,* 504 F.2d 970, 975 (5th Cir. 1974): "It is well settled that stipulations of fact fairly entered into are controlling and conclusive, and courts are bound to enforce them, ... even if the government is the party bound."

Moreover, were we free to begin with a fresh slate and derive our own figures on appeal, those adopted by the majority are unacceptable in several respects. First, the majority has substantially narrowed the eligible population by arbitrarily deciding that a minimum of seven years of schooling is the standard for determining "literacy." There is no evidence in the record as to how much education is needed to comply with the Louisiana statute requiring that jurors read and write the English language.[10] In *Castaneda* the Court looked at the population which had "some schooling."[11] In *La-*

*bat v. Bennett,* 365 F.2d 698, 728 (5th Cir. 1966) and again in *Newman v. Henderson,* 539 F.2d 502 (5th Cir. 1976), both Louisiana cases, this court considered the percentage of jury-age population having five or more years of education. Apparently relying on this circuit's precedents, the district court examined and utilized for the determination of eligible jurors the percentage of the male jury-age population non-occupationally exempt and having five or more years of education.

Although the majority states that the seventh grade literacy standard was established by the Louisiana Supreme Court, it cites as authority for this assertion *State v. Barksdale,* 247 La. 198, 170 So.2d 374 (1964), wherein the court attempted to justify the racial disparities by noting the greater number of whites than blacks with between seven and twelve years of education and the even larger number of college-educated whites. This generalized comparison falls short of establishing the minimum education needed to read and write and does not permit use of a population figure thus narrowed to establish the racial disparities on the jury list in question. Assuming arguendo that the standard is a proper one, or that it could be construed as legally adopted by the Louisiana court, it was not introduced or proved as such by the state in the court below where it could have been disputed, and may not be considered initially on ap-

10. L.S.A.–R.S. 15:172:

§ 172. Qualifications

The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows:

To be a citizen of this state, not less than twenty-one years of age, a bona-fide resident of the parish in and for which the court is holden, for one year next preceding such service, *able to read and write the English language,* not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color, or previous condition of servitude; and provided further, that the district judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.

In addition to the foregoing, jurors shall be persons of well known good character and standing in the community.
(emphasis supplied).

11. The Supreme Court's holding in *Castaneda* was based on general population statistics. In a footnote, the Court, in rejecting the state's argument that the disparities could be explained by differing literacy levels, narrowed the population to individuals over the age of 25 with some schooling and compared that to the representation on the grand jury. Using this narrowed statistic the Court found a 26% disparity which it termed a "significant disparity." The decision that a prima facie case had been proved, however, was not based on that statistic. 430 U.S. at 488–89 n. 8, 97 S.Ct. at 1276–77 n. 8.

peal. *Ramirez v. Sloss*, 615 F.2d 163 (5th Cir. 1980).

Second, the majority opinion rejects as "mere estimates" the population figures for 1962 and 1963, *stipulated* by appellant and the state and found by the district court, because they were derived by the three-point LaGrangian interpolation.[12] Instead, it compares the jury venire figures for the years 1962 and 1963 with the general population figures for the year 1960 in order to establish the disparity for the years 1962 and 1963. This reasoning is illogical. Moreover, in previous jury discrimination cases this court has employed the identical interpolation methodology utilized in the court below. *See Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966). In addition, at trial, the state offered no objection to the 1962 and 1963 population figures as found by the district court; indeed, the state *stipulated* to those figures. Again, the majority ignores our proper role as an appellate court.

Third, in determining the relevant black percentages on the general jury venire in 1962, the majority once more disregards the finding of the district court. The district court found:

> As of January 1, 1962, prior to drawing of the venire, blacks constituted approximately 14.9% of the general venire as embodied in the Orleans Parish jury wheel from which grand and petit jury venires were drawn.

In making this finding, the district court adopted the state's proposed finding. The majority, relying upon a paragraph from a stipulation[13] between the parties in the state trial court, produces two different figures for black percentage on the general venire: 19.43% and 16.64%.[14]

Reliance upon this paragraph is misplaced. It was not urged by the state at the evidentiary hearing, nor on appeal. Moreover, in this paragraph, the parties merely stipulated what the return showed; they did not stipulate that the figure shown on the return was correct as constituting the entire general venire. Specifically, this paragraph recited:

> 23. According to the return to the Subpoena Duces Tecum issued to the Jury Commission out of a total of 607 names in the jury wheel as of January 1, 1962, 118 or 19.43% were Negroes.
>
>   A. Note the figure 118 includes a category called indeterminate in which there were 34 persons.

Paragraph 23, however, cannot be read in isolation; it must be considered in conjunction with the paragraph that immediately follows:

> 24. According to the return to the Subpoena Duces Tecum issued to the Jury Commission out of a total of 1200 persons called for petit jury service as of January 1, 1962, 198 or 16.50% were Negro.

of the undetermineds are black. The state argued in the court below that 50% of the undetermineds were black, and the district court adopted this percentage. The majority, however, states that there is some support in the record for the assertion that 100% of the undetermineds were black. Aside from ignoring that the state proposed 50% in the district court, the assumption that 100% of the undetermineds were black has been demonstrated empirically to be false. At one point the race of 13 people listed as "undetermined" was determined. Of the 13, 6 were white. While statistically this does not prove the percentage of all unknowns, it does prove that not all undetermineds were black.

**12.** The three-point LaGrangian interpolation is a method of computing population figures for inter-census years based upon the actual census counts for the surrounding years. This formula is accepted by statisticians and was relied upon by this court in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966) (en banc).

**13.** The state court document, although bearing the caption "State of Louisiana versus Bruce Barksdale" and signed by the attorneys who represented Barksdale, recites that "the defendant herein, Morris Rowe is a member of the Negro Race." Presumably, this was a stipulation in an unrelated case which was also entered in the *Barksdale* case.

**14.** The first figure, 19.43%, assumes that all persons of undetermined race are black; the second figure, 16.64%, assumes that one-half

A. Note the figure 198 includes a category called indeterminate in which there were 60 persons.

The names of those persons called for petit jury service, referred to in paragraph 24, were drawn from the general venire. Therefore, an accurate total for the number of names in the general venire (jury wheel) as of January 1, 1962 must include the 1200 who were placed into the petit jury venire. The state apparently recognized this fact. The state's proposal for the percentage of blacks in the general venire obviously is derived by adding together the total numbers from paragraphs 23 and 24 (assuming that 50% of the "undetermineds" are black).[15] The language used by the trial judge in his finding that "*prior* to drawing of the venire, blacks constituted approximately 14.9% of the general venire" corroborates this interpretation. (Emphasis added.)

Under 28 U.S.C. § 2254(d)[16] a federal court may, in an evidentiary hearing, supplement facts not adequately developed in state court, and this was done in the court below. The state proposed to the district court, the district court found, and the state

---

**15.** The practice of the jury commission of not placing in the jury wheel at the same time all names of those subpoenaed and found qualified casts further doubt on the reliability of paragraph 23. Attached as an appendix to the opinion of the district court was a "Stipulation Regarding Jury Commission Practice." In pertinent part it stated:

The subpoenas compelled a person's appearance before the Jury Commissioners for qualification. The reverse side of the subpoena requested the recipient to supply various personal information among which was a racial designation. When a person appeared before the Jury Commission, he surrendered the completed subpoena. If he was found to be qualified, and was neither excused nor exempted, the process proceeded as follows. From the information contained on the qualifying subpoena, a white slip and a blue slip was prepared. Each slip had the name of the person, his address, and the place of work, but no racial designation. The blue slip was then filed in a master alphabetical file to be retained for possible use as a cross-check for accuracy when information was transferred from an old to a new city directory. The white slip was ultimately used in the actual drawing process. The subpoena was stapled to a card and filed in a separate file. From that point on, the subpoena and attached card were intended to be used for no purpose other than to record on the card each date that the white slip was removed from the jury wheel.

*For some number of these persons, who expressed a reason for not wishing to serve, the Jury Commission agreed in some cases not to put their names in the jury wheel, that is not to use them as prospective jurors, unless it became necessary.* For such persons, a blue and a white slip was not prepared immediately. On their subpoena was placed the letter "E" designating emergency use only. *These subpoenas were kept in a separate file* from which they were taken when additional jurors were needed. At that time, from the information contained on the subpoenas, blue and white slips would be prepared and the subpoena, with a card attached, would then be filed in the file with the other subpoenas and cards.

(emphasis supplied).

**16.** 28 U.S.C. § 2254(d) provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

\* \* \* \* \* \*

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

argues to this court that the percentage of blacks on the general venire in 1962 was 14.9%.[17] We must accept this figure as it is not clearly erroneous.

A table, attached to the state court document containing the disputed stipulation, lists figures for the number of blacks on the grand jury venire from 1954 through 1962, thus showing the underrepresentation over a "significant period of time."[18] This table[19] reveals that only 14% of the persons on the September 1962 grand jury venire were black. The document further indicates that from the March 1958 grand jury venire to the September 1962 venire, blacks constituted approximately 14% of the persons on the grand jury venires (and this figure assumes that *all* unknowns are black), while the percentage of blacks in the general population, as found by the trial judge, was roughly one third. As the grand jury venires were chosen randomly from the general venire it can be assumed, ab-

sent evidence to the contrary, that the disparities which existed between the percentage of blacks on the grand jury venires and the general population over the four-year period are approximately the same as existed between the percentage of blacks on the general venire and those in the general population.

The evidence at the evidentiary hearing showed that from September 1958 through September 1962 only two blacks were on each grand jury, except the September 1960 grand jury on which there was one black. The findings by the district judge for the years 1962 and 1963 as to the percentage of blacks in both the total population (1962—38.8%; 1963—39.5%) and the eligible population (narrowed to relevant age, not occupationally exempt, and literate: 1963—32%) together with the official censuses for 1950 and 1960, which show a slight increase in the black population over that twelve-year

17. See Supplementary Brief of Appellee for Rehearing En Banc at 28–29, footnote "f."

18. The Supreme Court in *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958)

and this circuit in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966) had officially found systematic exclusion of blacks in Orleans Parish, Louisiana over a period of years prior to 1960.

19.

| | Grand Jury Venire Total | Grand Jury Venire Negro & Colored | Percent of Total | Grand Jury Venire Negro, Colored & Undetermined | Percent of Total | Negroes Who Actually Served on Grand Jury |
|---|---|---|---|---|---|---|
| Mar. 54 | 75 | 6 | 8% | 12 | 16% | 0 |
| Sep. 54 | 75 | 6 | 8% | 9 | 12% | 0 |
| Mar. 55 | 75 | 5 | 6.6% | 11 | 14.6% | 0 |
| Sep. 55 | 100 | 9 | 9% | 15 | 15% | 2 |
| Mar. 56 | 75 | 8 | 10% | 9 | 12% | 0 |
| Sep. 56 | 75 | 6 | 8% | 8 | 10.6% | 0 |
| Mar. 57 | 125 | 10 | 8% | 13 | 10.4% | 3 |
| Sep. 57 | 75 | 5 | 6.6% | 10 | 13.3% | 0 |
| Mar. 58 | 100 | 7 | 8% | 14 | 14% | 1 |
| Sep. 58 | 100 | 7 | 7% | 10 | 10% | 2 |
| Mar. 59 | 100 | 10 | 10% | 15 | 15% | 2 |
| Sep. 59 | 100 | 6 | 6% | 11 | 11% | 2 |
| Mar. 60 | 75 | 6 | 8% | 10 | 13.3% | 2 |
| Sep. 60 | 75 | 9 | 12% | 12 | 16% | 1 |
| Mar. 61 | 75 | 8 | 10.6% | 10 | 13.3% | 2 |
| Sep. 61 | 75 | 11 | 14.6% | 11 | 14.6% | 2 |
| Mar. 62 | 75 | 10 | 13.3% | 14 | 18.6% | 2 |
| Sep. 62 | 100 | 14 | 14% | 14 | 14% | 2 |
| | 1,550 | 144 | 9.2% | 208 | 13.4% | 23 |

span, raise a strong presumption of systematic underrepresentation over these years.[20]

Accepting the district court's findings as not clearly erroneous,[21] I conclude that appellant presented a compelling case of significant underrepresentation of blacks on the general jury venire from which the grand jury and petit jury venires were drawn.

### B. *The Selection Procedure*

We turn next to the jury selection procedure to determine whether the system was "susceptible of abuse or not racially neutral." *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280.

The record reveals that as a first step in the process the jury commission subpoenaed for jury service qualification individuals selected at random from the city directory.[22] These individuals were required to complete a questionnaire, including race, on the reverse side of the subpoena and to appear before the commission at which time the subpoena was surrendered. The commission eliminated all prospective jurors found to be not qualified or exempt[23] and excused others because of hardship. The names of those found to be qualified and not excused were to be placed in the general venire.[24] At this stage, as found by the district court for the year 1962, the proportion of blacks was reduced from approximately one-third of those summoned to 14.9% actually placed on the general venire, a disparity of 18%. The Supreme Court has recognized that there is an opportunity for abuse in a system which permits the race of the potential juror to be known by the people selecting the jury. *See Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). *See also Ross v. Wyrick*, 581 F.2d 172 (8th Cir. 1978). The dramatic reduction in the representation of blacks at this level would suggest that advantage was taken of that opportunity.

Further potential for discrimination existed in the method of selecting grand juries. Twice a year a grand jury venire was drawn randomly from the general venire. The judge in charge of the grand jury for that term of court personally would select from the grand jury venire twelve persons for the grand jury. Again, the race was known. The fact that from September 1958 through September 1962 exactly two blacks were on each grand jury, except September 1960 when there was only one, negates the probability of random selection and forcefully indicates racial consideration. The testimony of two judges[25] buttressed

---

**20.** A table attached to the state court stipulation reveals an even smaller number of blacks serving on the grand jury for the period 1954 to 1958. The table is printed at note 19.

**21.** Rather than basing its conclusions on findings of the district court below, the majority opinion constantly alludes to the panel opinion in this case. Under our rules of procedure, once the case is voted en banc, the panel opinion is vacated.

**22.** The commission admittedly did not subpoena all males of jury age. It excluded those who could claim an occupational exemption from jury service under La.R.S. 15:174, such as physicians, firemen, attorneys and teachers. Additionally, it did not subpoena those who worked as day laborers for companies the commission knew from past experience would not pay its workers while they were on jury duty.

**23.** The Louisiana statute on juror qualifications is reprinted at note 10 *supra*.

**24.** In practice not all the names of persons qualified and not excused were placed in the general venire. Names of certain persons, who expressed a reason for not serving, were designated E (Emergency) and placed in the venire from time to time as necessary. *See* note 15 *supra.*

**25.** Judge Edward A. Haggerty, Jr., who impaneled the September 1960 grand jury which had only one black on it, testified at the hearing on Barksdale's Motions to Quash that "I had selected two Negroes and one didn't show up. I had alternatives in mind and I called for him at that time. I had selected two Negroes to serve on the grand jury in 1960." T. 246. Were it not for the absence of that party, there would have been two blacks on *every* grand jury from the time *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), was decided through the grand jury which indicted Barksdale. *Eubanks* held that the judges and jury commissioners of Orleans Parish had been in-

Barksdale's argument that there was exclusion through *limited* inclusion, a practice we disapproved in *Goins v. Allgood*, 391 F.2d 692 (5th Cir. 1968) and *Brooks v. Beto*, 366 F.2d 1 (5th Cir. 1966).[26]

The statistician who testified for appellant indicated that the probability of having exactly two blacks on each of those juries but one, given the amount of variance in the number of blacks on the venire, is less than one in a thousand. *See also* Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338 (1966) (utilizing the grand jury sequence in *Barksdale* as an illustration of systematic discrimination).[27] The district court made no finding of fact on this point, concluding that it was faced with "totally opposing views of competent and qualified experts."

Appellant's expert testified that the probability was less than one in a thousand that the 2–2–2–2–1–2–2–2–2 sequence was produced by random selection. The state's expert, on the other hand, testified that given the percentage of blacks on each venire, having two black grand jurors on a jury was not statistically unusual. This is undisputed. The question is whether the *consistent* selection of two black grand jurors over a period of years is sufficiently unusual to show a selection process not racially neutral. As the state's expert did not address himself to that question, the only evidence

in the record is the testimony of appellant's expert. The trial judge's finding that the evidence was hopelessly conflicting was, therefore, in error. I conclude that the sequence of black representation on the grand juries from September 1958 to September 1962 was sufficiently unlikely to indicate that the selection process was not racially neutral.

The significant underrepresentation proved by the statistical evidence, coupled with the evidence that the selection process was not racially neutral and afforded opportunities for abuse, presented a prima facie case of discrimination. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

### IV. *Rebuttal Evidence*

Once the petitioner presents a prima facie case of intentional discrimination, the burden to rebut shifts to the state. I disagree with the conclusion of the trial judge and the majority that the state carried its burden. Although we are bound by the clearly erroneous standard when reviewing the findings of fact of the district court, *Wade v. Mayo*, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); *Baker v. Metcalfe*, 633 F.2d 1198 (5th Cir. 1981); Fed.R.Civ.P. Rule 52, we are not bound by conclusions of law. *Horn v. C. L. Osborn Contracting Co.*, 591 F.2d 318 (5th Cir. 1979).

The district court conceded that the selection process was "haphazard" and that dis-

tentionally excluding blacks from grand jury participation, and directed that such conduct must stop. This court suggested in *Goins v. Allgood*, 391 F.2d 692 (5th Cir. 1968), that while total exclusion had perhaps ended with *Eubanks*, that exclusion through limited inclusion was present in the *Barksdale* case. 391 F.2d at 696–97.

As further evidence that there was race consciousness in the selection of grand jurors, Judge Thomas M. Brahney, Jr. testified in regard to the impaneling of a grand jury that had two blacks on it: "I distinctly recall there were two or three colored prospective jurors and one of them didn't wish to serve and even after I appointed them and one of them took ill and I called several others ... one of them became ill and called to see if I could replace him and one had a heart condition, and he quit the jury." It appears then that when one black grand juror fell ill he was purposefully replaced

with another black, suggesting the judge was not making race-neutral selections.

**26.** As Judge Brown stated in *Brooks*:

The dual requirements making awareness of race inevitable must be met, but this must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation. *Id.* at 24.

**27.** The Supreme Court cited this article in *Whitus v. Georgia*, 385 U.S. 545, 552 n.2, 87 S.Ct. 643 n.2, 17 L.Ed.2d 599 (1966) in concluding that the probability of the underrepresentation in that case was .000006. The article again was cited by the Court in *Castaneda*, 430 U.S. at 496 n.17, 97 S.Ct. at 1281 n.17.

parities existed which "had not been reduced to the desired percentages." He concluded, however, that a "sincere effort" was being made to reduce the underrepresentation and that the jury commission and the judges were not engaged in invidious racial discrimination and purposeful exclusion of blacks.[28]

The majority similarly concludes that the evidence presented by the state adequately rebutted the prima facie case. The majority cites with approval the testimony of the state judges that they did not intentionally include or exclude blacks from jury service. It is well established that conclusory statements by judges and jury commissioners that there was no discrimination in jury selection will not rebut a prima facie showing; there must be concrete proof. See e. g., Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (per curiam); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Ross v. Wyrick, 581 F.2d 172 (8th Cir. 1978). Although the judges and commissioners attempted to explain the reduction between the number of blacks summoned for jury qualification and the number actually placed in the general venire by stating that many blacks requested "hardship" excuses or failed to meet literacy requirements, no specific evidence was introduced by the state to corroborate these statements.

Moreover, the testimony of the judges as to the inclusion of two blacks on each grand jury, see note 25 supra, negates the assertion that they did not intentionally include

or exclude blacks from the grand or petit juries. In addition, one, who testified that he did not use race as a factor in qualifying grand jurors, admitted that he "feels generally Negroes are less qualified than whites to serve as grand jurors." [29]

The state offered no evidence as to how many or under what conditions wage earners were excused for "hardship." This court disapproved the exclusion of all wage earners as a class in Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966). The majority distinguishes Labat on the ground that Labat held unconstitutional the total exclusion of wage earners; here, the district court found that the jury commission did not exclude the entire class. Yet, the principal justification offered by the state for reducing by approximately one-half the percentage of blacks summoned to the percentage placed on the general venire is that daily wage earners were excused. Assuming arguendo that the reduction is due to excusing wage earners, exclusion sufficiently widespread to create this kind of disparity refutes the probability that the general venire represented a cross section of the population.

The majority notes that the record lacks statistics detailed enough to calculate the exact racial breakdown of the population meeting the statutory criteria for juror qualification. Castaneda defines the burdens of proof of both petitioner and the state: it is for the petitioner to prove underrepresentation by showing the disparity between the proportion of the group in the total population and those on the jury venire; the burden is on the state to explain the disparity by evidence including narrowed population figures. Here, appellant, not the state, introduced population figures narrowed by virtue of age, sex, occupation, and schooling, which figures the state accepted. If other factors further could have

---

**28.** The fallacy of this conclusion is demonstrated by the district court's statement: "The testimony and evidence demonstrates that an attempt was being made to comply with the dictates of Labat." This court decided Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966) in 1966. The practices at issue in this case occurred in 1962 and 1963.

**29.** This statement is contained in a stipulation entered into by appellant and the state before appellant's trial (in the record on appeal at p. 342). The judge who made this statement presided at appellant's trial.

narrowed the disparity, the burden was on the state to present them. We cannot, at the appellate level, speculate as to possible justifications; we are limited to the evidence introduced in the court below.

I conclude that the state failed to rebut the prima facie case of intentional discrimination. I would reverse the district court. Therefore I dissent.